# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**PRINCE D. BROWN,**

                    **Plaintiff,**

**-vs-**                                                    **Case No.  6:09-cv-750-Orl-31GJK**

**SCHOOL BOARD OF ORANGE
COUNTY, FLORIDA,**

                    **Defendant.**
_____

# ORDER

This matter comes before the Court on the Motion for Summary Judgment (Doc. 18) filed

by the Defendant, Orange County School Board ("OCSB"), the response (Doc. 34) filed by the

Plaintiff, Prince Brown ("Brown"), and the reply (Doc. 35) filed by OCSB.

## I.      Background

Except where noted, the following facts are undisputed.  Brown, who is African American,

was hired in February 2007 as an Environmental Standards Coordinator, working within OCSB's

Safety, Security and Environmental Services Department.  During Brown's employment, that

department had two other Environmental Standards Coordinators: James Roberts ("Roberts") and

Zachery Smith ("Smith").  Brown reported to Steve Arcidiacono ("Arcidiacono"), who in turn

reported to Rick Harris ("Harris"), the Senior Director of Safety, Security and Environmental

Services for OCSB.  Roberts, Smith and Arcidiacono are Caucasian; Harris is African American.

Brown's duties involved dealing with hazardous materials found on OCSB property,

including school grounds and OCSB's offsite chemical storage facility.  (That storage facility was

located on Magic Way and was commonly referred to as the "Magic Way facility").  At the conclusion of Brown's 90-day probationary period, Arcidiacono recommended that he be retained. Brown's contract was renewed on July 2, 2007 for the 2007-08 school year.

In July 2007, the Florida Department of Environmental Protection ("FDEP") inspected chemistry labs at six Orange County high schools.  Prior to the inspection, Brown, Smith, and Roberts, among others, were dispatched to the schools so that hazardous waste problems could be discovered and remediated before FDEP arrived.  Despite this, FDEP found a number of problems relating to hazardous materials.  In early August 2007, the FDEP inspected the Magic Way facility and found additional problems there.  OCSB contends that the hazardous material problems at the high schools and the Magic Way facility were within Brown's area of responsibility.  Brown disputes this.  In addition, allegations surfaced that Brown had improperly moved some hazardous materials, an allegation Brown also disputes.

On August 13, 2007, Brown was placed on suspension with pay.  According to the affidavit of Carianne Reggio ("Reggio") (Doc. 26), who served as one of the Senior Managers of OCSB's Employee Relations Department during most of Brown's employment, such suspensions are routine when an employee faces serious allegations or when a governmental agency such as FDEP is looking into allegations of impropriety on the part of an employee.  (Doc. 26 at 1-2). Neither Roberts nor Smith were punished in connection with the FDEP inspections.  On November 6, 2007, Brown's suspension was lifted, but rather than returning to his position as an Environmental Standards Coordinator, he was reassigned to a different area – construction contracting.

In March 2008, the FDEP issued a Hazardous Waste Inspection Report, describing serious problems involving hazardous waste.  Brown was again suspended with pay.[1]  That month, Brown met with Reggio.  At that meeting Brown handed Reggio a letter, which he contended he had turned over to the Employee Relations Department in August 2007.  The letter detailed a number of health and safety violations that Brown had allegedly observed and reported to Arcidiacono, but which Arcidiacono had not addressed.  (Doc. 1-2 at 1).  The copy provided by Brown to Reggio was not signed or dated, and did not bear any indication that it had been received by Employee Relations, such as a time/date stamp.  (Doc. 1-2 at 1).  Reggio contends that she first saw the letter when Brown handed it to her in March 2008.  (Doc. 26 at 3).  No OCSB employee admits having seen the letter prior to March 2008.

On April 23, 2008, Harris sent Brown a letter informing him that his contract would not be renewed.  Brown's last day of work for OCBS was June 30, 2008, the date his contract ran out.  Both Smith and Roberts continued to work for OCSB.

On May 1, 2009, Brown filed the instant suit.  In Count I, he alleges that he was discriminated against on the basis of his race in violation of Title VII.  In Count II, he alleges that he suffered discrimination in violation of 42 U.S.C. § 1981.  In Count III, he alleges that he was

---

[1]As with the first suspension, OCSB contends that the May 2008 suspension was not punitive. According to Reggio, it was the Employee Relations Department's "routine practice . . . to place an employee on relief of duty when a governmental agency issues a report with serious allegations potentially implicating the employee." (Doc. 26 at 2).  According to her affidavit, the department removes employees from their work locations under such these circumstances "so that the investigation is impartial, so that the potential for the employee to influence the investigation is removed, etc." (Doc. 26 at 2).

punished and ultimately terminated as a result of his letter to Employee Relations, in violation of the First Amendment to the United States Constitution.

## II.       Standards

### A.       Summary Judgment

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the

non-movant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

### B.      Racial Discrimination

To establish a Title VII discrimination claim, a plaintiff must present proof of discriminatory intent through either direct or circumstantial evidence. *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000). "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Id.* (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)). Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004). Comments or conduct falling short of this mark are, at best, circumstantial evidence. *See id.* Where the plaintiff is able to prove by direct evidence that the employer acted with a discriminatory motive, the employer to prevail must prove, by a preponderance of the evidence, that the same decision would have been reached even absent that motive. *Miles v. M.N.C. Corp.*, 750 F.2d 867, 875-76 (11th Cir. 1985).

In a case where there is no direct evidence of discrimination, a court is to analyze whether summary judgment is appropriate under the familiar framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Barton*, 450 U.S. 248 (1981). *See Wilson*, 376 F.3d at 1087. Under that framework, the plaintiff first bears the threshold burden of establishing a prima facie case of discrimination. *Id.* The manner of doing so is not fixed; rather, it depends to a large degree on the situation. *Id.*; *Jones v. Gerwens*, 874 F.2d 1534, 1539 (11th Cir. 1989). A prima facie case is established, in a given situation, by evidence

that tends to eliminate the most common nondiscriminatory reasons for an employer's action.  *See Gerwens*, 874 F.2d at 1539.  Generally speaking, a plaintiff may establish a prima facie case of race discrimination by showing that: (1) he belongs to a racial minority; (2) he was subjected to adverse employment actions; (3) his employer treated similarly-situated employees outside his racial minority more favorably; and (4) he was qualified to do the job.  *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  Failing that, the plaintiff must, at least, meet the threshold of establishing facts to support a reasonable inference of discriminatory intent.  *Id.* at 1562, 1564; *Wilson*, 376 F.3d at 1087, 1092.

If the plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises, and the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions.  *Wilson*, 376 F.3d at 1087.  The employer "need not persuade the court that it was actually motivated by the proffered reasons."  *Id.* (citation omitted).  If the proffered reason might motivate a reasonable employer, the presumption of discrimination is rebutted.  *Id.*  The plaintiff must meet any such proffered reason head on, rather than quarrel with its reasonableness, and prove that it is a pretext – *i.e.*, the proffered reason did not honestly motivate the employer.  *Id*; *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (holding that, regardless of whether the proffered reason is unfair, heavyhanded, or based on erroneous facts, the "inquiry is limited to whether the employer gave an honest explanation of its behavior.") (citations omitted).

## C.    Protected Speech

It is clearly established that the government may not discharge an employee on a basis that infringes the employee's constitutionally protected interest in freedom of speech.  *See, e.g.*, *Rankin*

*v. McPherson*, 483 U.S. 378, 383 (1987).   To determine whether a public employee's speech is

entitled to First Amendment protection, the court must first determine whether the employee spoke

as a citizen on a matter of public concern.  *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).  If the

answer is no, the employee has no First Amendment cause of action based on his or her

employer's reaction to the speech.  *Id.*  "[W]hen public employees make statements pursuant to

their official duties, the employees are not speaking as citizens for First Amendment purposes, and

the Constitution does not insulate their communications from employer discipline."  *Id.* at 421.

However, neither the fact that the statements are made at the office, rather than in public, or that

they concern the subject of the employee's job is dispositive of the issue.  Such statements may

still qualify for First Amendment protection.  *Id.*  Rather, the controlling factor in such

circumstances is whether the expressions were made pursuant to the employee's official duties.

*Id.*

A four-stage analysis has evolved for examining cases involving a public employee's

exercise of First Amendment rights.  At the first stage, the court must determine whether the

employee's speech may be fairly characterized as constituting speech on a matter of public

concern.  *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1157 (11th Cir. 2002) (citations

omitted).  This involves an examination of "the content, form, and context of the speech."  *Id.*  If

that threshold requirement is met, the court then applies a balancing test, weighing the interests of

the public employee against the interest of the public employer, again considering the context and

circumstances of the employee's speech.  *Id.*  (citing *Rankin*, 483 U.S. at 388).   The first two

stages of this analysis involve questions of law for the court.  *Id.*

Only if the first two stages are satisfied does the matter go to the fact-finder for a determination of whether the speech which the court has identified as protected played a substantial part in the employment decision. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977). If so, then the employer must prove that it would have reached the same decision even in the absence of the protected speech. *Brochu* at 1157. This fourth stage is sometimes called the "but for" test. *Id.* To satisfy this test, the employer must show that "its legitimate reason, standing alone, would have induced it to make the same decision." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252 (1989).

## III.   Analysis

Brown admits that he has no direct evidence of discriminatory intent on the part of the Defendant. Accordingly, he must establish discrimination by way of the *McDonnell Douglas* framework. There is no dispute as to whether he is a member of a racial minority, and that he suffered adverse employment actions. Thus, Brown's claim satisfies the first two *McDonnell Douglas* elements. As for the fourth element, OCSB does contend that Brown was not qualified for his position, arguing that he lied about having Hazardous Waste Operations and Emergency Response training, and that he did a poor job. But OCSB has not provided any evidence that such training was a requirement for Brown's position, and evidence that someone performed poorly in a job is not necessarily evidence that the person was not qualified for the job. Accordingly, there is at least a disputed issue of material fact as to whether Brown was qualified for his position.

Despite this, Brown has not established his *prima facie* case of discrimination, as required under the *McDonnell Douglas* framework. Brown has not produced any evidence from which a

reasonable jury could conclude that OCSB treated similarly situated employees outside his protected class more favorably than he was treated.

Brown complains that he was wrongfully suspended, transferred, suspended again and ultimately terminated as a result of hazardous waste problems uncovered during the FDEP inspections, while Roberts and Smith were not disciplined in any way, and both had their contracts renewed.[2]  OCSB asserts that the suspension resulted from allegations that Brown had improperly removed chemicals from one of the high schools during the FDEP inspections, and because of an ongoing FDEP investigation into what it describes as "Brown's area of responsibility."  (Doc. 18 at 7).  Brown points out that he, Roberts and Smith all worked in the same department and shared the same job title – Environmental Standards Coordinator.  In addition, all three were members of teams dispatched to the high schools that the FDEP intended to visit in July 2007 so that hazardous materials problems could be identified and rectified before the state inspection.  Despite their participation in this (ultimately unsuccessful) effort, neither Roberts nor Smith suffered any adverse employment action.

The United States Court of Appeals has held that to prevail under the *McDonnell Douglas* framework, the employee must show that the purported comparators are similarly situated "in all relevant respects."  *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003).  Although Brown, Roberts, and Smith shared a job title, Brown has produced no evidence that they

---

[2]Initially, Brown also complained that white co-workers also received better treatment in that they were given offices and access to equipment (such as county vehicles) while he was not.  In the instant motion, OCSB offered evidence that disparities were the result of legitimate factors such as seniority or job requirements.  In his response to the motion, Brown appears to have abandoned this line of argument, and therefore this opinion will not address it.

were similarly situated with respect to hazardous waste issues.  According to the (unrebutted)

evidence produced by OCSB, each of the three had different areas of responsibility.  Smith was

primarily responsible for indoor air quality and asbestos management, while Roberts primary

responsibility was in the area of environmental permitting.  (Doc. 18 at 3-4).  Although Brown

disputes the extent of his responsibilities, he admits that it involved dealing with hazardous waste

issues, such as storage of hazardous materials.  (*See*, *e.g.*, Doc. 1 at 3-4, Doc. 1 at 7).  In addition,

the performance evaluation given to Brown in connection with the conclusion of his 90-day

probationary period (Doc. 23-4) shows that he was expected to oversee numerous hazardous waste

issues.  The list of responsibilities evaluated included the following:  "Investigate and remediate

Hazardous Materials Deficiencies noted on regulatory inspections of District facilities" (Doc. 23-4

at 3) (capitalization in original); "Develop, implement and direct procedures for the disposal of

classroom science materials, classroom science chemicals and hazardous and non-hazardous

materials" (Doc. 23-4 at 3); and "Develop training programs and instruct all maintenance

employees in environmental subject matter, such as Radon, Hazardous Waste, Hazardous

Materials requisition and storage and other technologies" (Doc. 23-4 at 4) (capitalization in

original).  Brown has not produced any evidence that Roberts or Smith had any oversight

responsibilities with regard to hazardous waste issues, such that they might be expected to be

disciplined in the same manner as Brown when problems arose during the FDEP inspections.  As

such, Brown has not shown that Roberts or Smith are valid comparators, and he cannot establish

his prima facie case.

     In addition, Brown's lack of evidence of intentional discrimination is fatal to his Section

1981 claim.  *See Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d

132 (1989).  Accordingly, OCSB is entitled to summary judgment as to the first two counts of

Brown's complaint.

In his third count, Brown argues that he was punished in violation of the First Amendment

for his speech on a matter of a public concern.  Specifically, he contends that he informed OCSB's

Employee Relations Department of certain hazardous waste issues, including rule violations, and

attempts to cover them up by his boss, Arcidiacono.   Brown met with Alfred Lopez ("Lopez"),

one of the Senior Managers in the Employee Relations Department, in late July 2007 and told him

of his concerns.  (Doc. 34 at 6).  He says that Lopez asked him to document his concerns, so

shortly thereafter he drafted a letter, outlining the problems he had encountered, and delivered it to

Lopez.[3]  (Doc. 34 at 6).  Brown contends that his suspensions and his eventual termination were

done in retaliation for his having brought the hazardous waste issues to the attention of his

superiors at OCSB.  OCSB asserts that it was forced to make enormous cuts in its budget, and

Brown was let go simply because he had the least seniority in his department.

To show that his report to Employee Relations resulted in his termination, Brown relies on

the timing of certain events.  He points out that his first suspension with pay occurred less than

two weeks after he met with Lopez, and he notes that he received his notice of termination less

---

[3]Lopez recalls meeting with Brown around this time, but says Brown only spoke in terms of theoretical situations, without detailing any specifics or naming any names.  Lopez says he told Brown to put his concerns down on paper, because he could not deal with theoretical issues.  According to Lopez, Brown did not return, and he denies that Brown provided him with the letter that Brown later turned over to Reggio.  For purposes of analyzing this motion for summary judgment, however, the Court will credit Brown's testimony that he provided his letter to Lopez in early August 2007.

In addition, the Court notes that the letter has a "Cc:" notation to Orange County School Board Superintendent Ron Blocker.  However, there is no evidence – from Brown or anyone else – that Blocker received the letter.

than a month after meeting with Reggio and turning over a copy of the letter that, he contends, he

had provided to Lopez months earlier.  As further support, Brown points to an OCSB internal

document, an "Internal Reporting Form."  (Doc. 34-12 at 14).  The document, which identifies

Brown as its subject, bears an opening date of March 18, 2008 and a closing date of July 25, 2008.

(Doc. 34-12 at 14).  The opening date is typed, while the closing date is handwritten.  In the

comments section, the following typewritten words appear:  "FAILURE TO FOLLOW SAFETY

AND OTHER ESTABLISHED PROCEDURES".  (Doc. 34-12 at 14) (capitalization in original).

The comments section also contains a handwritten note, stating "Non-reappointed: Performance."

(Doc. 34-12 at 14).  Brown argues that this form contradicts the official justification for his

termination (that he was laid off due to budget cuts), suggesting that OCSB is trying to disguise its

true motivation – his letter to Lopez.

Brown's claim fails, however, because the letter to Lopez did not constitute protected

speech.  The letter's content is entirely related to Brown's job, his boss, and the problems he

personally was suffering on that job.  It recites a number of hazardous waste issues that Brown

allegedly observed and reported to Arcidiacono, such as "stockpiling" of hazardous waste at the

Magic Way facility, transportation of hazardous chemicals over the roadway, failing to follow a

"1999 EPA consent order," and forcing Brown to hurry his work.[4]  (Doc. 34-12 at 10).  Although

the public would have legitimate concerns about a number of these allegations, the letter reads

much more like someone complaining about his job than it does like someone concerned about the

_____

[4]According to Brown, being forced to hurry meant that he "received cuts or abrasions, inhaled toxic gases, spilled and cleaned up multiple carcinogens, faced free-roaming classroom snakes and tarantulas . . .".  (Doc. 34-12 at 10).

public welfare. The Court also notes that the letter does not discuss potential harm to the public resulting from these activities, but does discuss harm to Brown himself and the possibility of FDEP inspectors uncovering "costly" violations. (Doc. 34-12 at 10). The form of the speech reinforces this conclusion. Rather than a communication in a public forum, such as a letter to the editor, Brown shared the letter with OCSB's Employee Relations Department. Again, this appears more like the actions of someone with complaints about his job (and his boss) rather than someone discussing matters of public concern.

Even if the Lopez letter were to be considered protected speech, Brown's claim would fail because of a lack of evidence that it led to his termination. As noted above, the unrebutted evidence is that OCSB suspends all employees facing the kind of scrutiny that Brown came under after the FDEP inspections. As for the Internal Reporting Form, the out-of-context notation that he was not reappointed due to performance is not enough to create a genuine issue of material fact as to the true reason that he lost his job. Brown has no evidence that the decisionmaker who decided not to reappoint him even knew about the letter to Lopez. The person who filled out the Internal Reporting Form, Reggio, testified that she began investigating Brown's job performance as a result of the FDEP report in March 2008, but never reached any conclusions one way or the other about Brown's job performance and had no knowledge of why his contract was not renewed. (Doc. 41 at 32-33). Reggio testified that, at the end of the school year, she saw on OCSB's computer system a notation that Brown had been non-reappointed due to performance, and added that information by hand as part of the closing of the file. (Doc. 41 at 33). No reasonable factfinder could conclude, based solely on that one statement in the Internal Reporting Form that

he had been non-reappointed due to performance, that the *true* reason Brown was not reappointed was to punish him for speaking out about hazardous waste issues at OCSB.

Accordingly, the Court concludes that OCSB is also entitled to summary judgment on Count III.

**IV.     Conclusion**

In consideration of the foregoing, it is hereby

**ORDERED** that the Motion for Summary Judgment (Doc. 18) filed by the Orange County School Board is **GRANTED**.  The Clerk is directed to enter judgment in favor of the Orange County School Board and against the Plaintiff, Prince Brown, and to close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on January 20, 2011.

                                    **GREGORY A. PRESNELL**
                              **UNITED STATES DISTRICT JUDGE**

Copies furnished to:

Counsel of Record
Unrepresented Party

-14-